# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIANCE PARTY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 20-2319 (JEB) |
| DISTRICT OF COLUMBIA BOARD OF ELECTIONS, | |
| Defendant. | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................. 2

   I.    Statutory Overview ....................................................................................... 2

   II.   COVID-19 in the District of Columbia.................................................... 4

   III.  Plaintiffs' Allegations and Procedural History..................................... 6

LEGAL STANDARD...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

   I.    The Balance of Equities and Public Interest Counsel Against a Preliminary Injunction. .............................................................................. 8

   II.   Plaintiffs Cannot Show a Likelihood of Success on the Merits. ................... 11

     A.   The District Did Not Violate Plaintiffs' First and Fourteenth Amendment Rights. ....................................................................................................... 12

     B.   The District Did Not Violate Plaintiffs' Due Process Rights. ....................... 18

   III.  Plaintiffs Cannot Show They Will Suffer Likely and Imminent Irreparable Harm Absent Court-Ordered Relief. ............................................................. 20

CONCLUSION............................................................................................................. 21

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ....................................................... 7

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................. 13, 14, 16

*Burdick v. Takushi*, 504 U.S. 428 (1992) .............................................................. 13, 14

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) .................................. 19

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)
   (*CFGC*) .................................................................................................. 7, 20

*Clements v. Fashing*, 457 U.S. 957 (1982) ................................................................. 13

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ........... 7, 11, 21

*De La Fuente Guerra v. Toulouse-Oliver*, 752 F. App'x 579 (10th Cir. 2018) ........... 20

*De La Fuente v. California*, No. 16-56261, 686 F. App'x 383 (Mem.) (9th Cir. Mar.
   30, 2017) ................................................................................................... 10

*De La Fuente v. Kemp*, Civil Action No. 16-2937, 2016 WL 9023598 (N.D. Ga. Aug.
   30, 2016) .............................................................................................. 10, 11

*De La Fuente v. Merrill*, 214 F. Supp. 3d 1241 (M.D. Ala. 2016) ............................. 10

*De La Fuente v. Padilla*, 930 F.3d 1101 (9th Cir. 2019) ........................................... 15

*De La Fuente v. S. Carolina Democratic Party*, 164 F. Supp. 3d 794 (D.S.C. 2016) 10

*Dixon v. District of Columbia*, 666 F.3d 1337 (D.C. Cir. 2011) ................................. 12

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003) ........................... 7

*Garbett v. Herbert*, — F. Supp. 3d —, 2020 WL 2064101 (D. Utah Apr. 29, 2020) .... 9

*Garcia v. Griswold*, Civil Action No. 20-1268, 2020 WL 4003648 (D. Colo. Jul. 15,
   2020) .......................................................................................................... 10

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir.
   2019) ............................................................................................................ 9

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir 2013) ............................................... 7

*Jenness v. Fortson*, 403 U.S. 431 (1971) ................................................. 14, 15, 16, 18

*Kamins v. Bd. of Elections for the District of Columbia*, 324 A.2d 187 (D.C. 1974) 15, 16

*Libertarian Party of Ill. v. Pritzker*, — F. Supp. 3d —, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) ........................................................................................... 17

*Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20 (1st Cir. 2016) ........ 14

*Libertarian Party v. District of Columbia Bd. of Elections & Ethics (Libertarian Party I)*, 768 F. Supp. 2d 174 (D.D.C. 2011) ............................................ 12

*Libertarian Party v. District of Columbia Bd. of Elections & Ethics (Libertarian Party II)*, 682 F.3d 72 (D.C. Cir. 2012) ............................................ 13, 17

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................. 19

*Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) ........................... 20

*Palmore v. United States*, 411 U.S. 389 (1973) ............................................ 2

*Paul v. Davis*, 424 U.S. 693 (1976) ................................................... 19, 20

*Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ................. 20, 21

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ....................................... 7

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ................................. 13

*Tripp v. Scholz*, Civil Action No. 14-0890, 2014 WL 4179840 (S.D. Ill. Aug. 22, 2014) ........................................................................................... 10

*Williams v. Rhodes*, 393 U.S. 23 (1968) .................................................. 14

*Williams v. Rhodes*, 393 U.S. 23 (1968) .................................................. 12

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................. 7, 8

## Statutes

42 U.S.C. § 1983 ......................................................................... 6

67 D.C. Reg. 5235 ....................................................................... 17

67 D.C. Reg. 9865 ........................................................................ 6

D.C. Code § 1-1001.08(b)(3A) ......................................................... 5, 9, 19

D.C. Code § 1-1001.08(d) ................................................................. 3

D.C. Code § 1-1001.08(f) ........................................................................... 15

D.C. Code § 1-1001.08(o)(1) ...................................................................... 11

D.C. Code § 1-204.04(e) ...................................................................... 6, 17

D.C. Code §§ 1-1301 ................................................................................... 2

D.C. Code §§ 1-201.01 ............................................................................... 2

Pub. L. No. 376, 69 Stat. 699 (1955) ........................................................ 2

Pub. L. No. 87-389, 75 Stat. 817 (1961) ................................................... 3

Pub. L. No. 93-92, 87 Stat. 311 (1973) ..................................................... 3

## Constitutional Provisions

U.S. Const. amend. XXIII ........................................................................ 3

U.S. Const. Art. I .................................................................................... 2

## Legislative History Materials

H. Rep. No. 93-258 (1973) ........................................................ 2, 4, 18, 21

S. Rep. No. 869 (1961) .......................................................................... 18

S. Rep. No. 93-371 (1973) ............................................................. 4, 18, 21

## Regulations

3 DCMR § 1503.01 ................................................................................... 3

3 DCMR §§ 1500-1508 .......................................................................... 18

## INTRODUCTION

Plaintiffs Alliance Party and Roque "Rocky" De La Fuente seek a temporary restraining order (TRO) or a preliminary injunction (PI) against the District of Columbia Board of Elections (BOE, or the District), extending Mr. De La Fuente's deadline to submit a petition to appear on the November 2020 ballot as a candidate for President of the United States. Plaintiffs contend that they suffered violations of their First and Fourteenth Amendment rights when the D.C. Council passed legislation lowering the signature-gathering requirement for Presidential candidates amid the COVID-19 pandemic. Plaintiffs, however, cannot show that injunctive relief is warranted.

Mr. De La Fuente was not prevented from trying to gather signatures for his petition. Despite plaintiffs' repeated contention that COVID-19 imperiled in-person signature gathering, the D.C. Council passed legislation nearly four months ago permitting candidates to gather signatures electronically for the November 2020 general election. Plaintiffs made no efforts in the ensuing months, either to challenge the signature-gathering requirement or to gather electronic signatures. The D.C. Council then voted to reduce the signature-gathering requirement for presidential candidates on July 28, 2020—more than a week before the August 5, 2020 deadline to submit a petition. Conceding they have collected no signatures to date, plaintiffs now ask this Court to upend BOE's operations and risk delaying the production of general election ballots for all District residents. The balance of the equities and the public interest strongly disfavor preliminary relief under such circumstances.

Additionally, plaintiffs cannot show they are likely to succeed on the merits of their constitutional claims, as the District has done nothing to infringe on their rights under the First and Fourteenth Amendments, nor has the District deprived them of Due Process. Finally, plaintiffs cannot show a likelihood of irreparable harm, as they have provided no indication that they can in fact acquire the necessary signatures by the deadline they have proposed. Plaintiffs' motion should be denied.

## BACKGROUND

### I.   <u>Statutory Overview</u>

The U.S. Constitution grants Congress "plenary" power to legislate for the District. *See Palmore v. United States*, 411 U.S. 389, 397 (1973) (citing U.S. Const. Art. I, § 8, clause 17). Congress served as the sole legislative body for the District until passage of the Home Rule Act in 1973, which delegated limited legislative authority to the D.C. Council subject to Congressional approval. *See generally* D.C. Code §§ 1-201.01 *et seq.*

In 1955, Congress passed the District of Columbia Election Act (the Election Act), providing for the direct election of national party committee members and convention delegates by District residents. Pub. L. No. 376, 69 Stat. 699 (1955); D.C. Code §§ 1-1301 *et seq.*; *see also* H. Rep. No. 93-258, at 1 (1973). On March 29, 1961, the states ratified the 23rd Amendment to the United States Constitution, which expressly provides that the District shall appoint electors to the Electoral College "in such a manner as Congress may direct," U.S. Const. amend. XXIII, § 1, and that Congress "shall have the power to enforce" those mandates "by appropriate

2

legislation," *id.* § 2. Accordingly, later that year, Congress amended the Election Act to include provisions by which candidates for President and Vice President of the United States could appear on the ballot in District elections. Pub. L. No. 87-389, 75 Stat. 817 (1961) (1961 Amendment). Among other things, the 1961 Amendment provided that candidates of any political party that had elected a U.S. President since 1950 would automatically appear on the ballot.[1] *Id.* Third-party candidates for president and vice president could also appear on the ballot upon submitting a timely petition to BOE "signed by at least 5 per centum of registered qualified electors of the District of Columbia." *Id.*

Congress, however, amended the Election Act again twelve years later to reduce the signature requirement from 5 percent to 1 percent of registered voters in the District. Pub. L. No. 93-92, 87 Stat. 311 (1973) (1973 Amendment); *see also* 3 DCMR § 1503.01 (BOE regulation implementing one-percent requirement). The Committee Reports from both the House and Senate Committees on the District of Columbia (collectively, the Committee Reports) observed that at the time, five percent of registered District voters amounted to roughly 15,000 signatures a non-major-party candidate would have to collect, which, in Congress's judgment, "place[d] unreasonable burdens upon both potential candidates and the [D.C.] Board of Elections." H. Rep. No. 93-258, at 3; S. Rep. No. 93-371, at 3 (1973). The Committees observed that as of 1968, 42 states required non-major-party Presidential candidates

---

[1]    This provision was later changed to automatically include on the ballot candidates of any party that received 7,500 votes in the previous election. D.C. Code § 1-1001.08(d).

to obtain signatures from at most one percent of registered voters in order to appear on the ballot. *Id.* The Committees concluded that this widespread practice "suggests that the 1% required proposed by [the amendment] is entirely reasonable." *Id.*

## II.   COVID-19 in the District of Columbia

On March 11, 2020, Mayor Muriel Bowser issued a Declaration of Public Emergency and a Declaration of Public Health Emergency in response to the global outbreak of COVID-19, an infectious respiratory illness caused by the novel coronavirus. *See* Mayor's Order 2020-045, March 11, 2020, available at https://www.dcregs.dc.gov/Common/DCR/Issues/IssueDetailPage.aspx?issueID=821 (last visited Sept. 1, 2020); Mayor's Order 2020-046, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachment s/MO.DeclarationofPublicHealthEmergency03.11.20.pdf (last visited Sept. 1, 2020). Shortly thereafter, on March 30, 2020, Mayor Bowser issued a Stay at Home Order, restricting when District residents could leave their homes, gather in groups, or use communal spaces. *See* Mayor's Order 2020-054, March 30, 2020, available at https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attac hments/Mayor%27s%20Order%202020-054%20Stay%20at%20Home.pdf (last visited Sept. 1, 2020).

On May 13, 2020, Mayor Muriel Bowser signed into law the Coronavirus Omnibus Emergency Amendment Act of 2020 (May 13, 2020 Emergency Act). *See* 67 D.C.     Reg.     5235     (May     22,     2020),     available     at https://lims.dccouncil.us/downloads/LIMS/44622/Signed_Act/B23-0750-SignedAct

.pdf (last visited Sept. 1, 2020). Among other things, the law reduced the number of signatures third-party candidates for several local and federal offices must collect to appear on the November 2020 general election ballot in the District. The law also permitted candidates to gather signatures electronically rather than in person. *See* D.C. Code § 1-1001.08(b)(3A). The Council left unchanged the requirement that third-party candidates for the offices of President and Vice President must collect signatures from one percent of eligible District voters in order to appear on the ballot. For the November 2020 election, that number would have been 4,967 signatures. *See* Decl. of Alice P. Miller (Miller Decl.), Ex. A ¶ 3. Two weeks later, Mayor Bowser lifted the stay-at-home order effective May 29, 2020, amid the phased reopening of District businesses, government operations, services, and activities. *See* Mayor's Order 202-067, May 27, 2020, available at https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/MO2020-067.pdf (last visited Sept. 1, 2020).

On July 28, 2020, the D.C. Council unanimously passed legislation reducing the required signature threshold for third-party presidential candidates to 250 valid signatures for access to the November 2020 general election ballot. *See* D.C. Council, General Election Preparations Emergency Amendment Act of 2020 (July 2020 Amendment), Sec. 2(d)(3), available at https://lims.dccouncil.us/downloads/LIMS/45462/Signed_Act/B23-0864-Signed_Act.pdf (last accessed Sept. 1, 2020); July 2020 Amendment Legislative History [4-3] at 2, available at https://lims.dccouncil.us/Legislation/B23-0864 (last visited Sept. 1, 2020). The

Council transmitted the legislation to the Mayor on August 3, 2020, giving the Mayor until August 17, 2020, to sign the bill, veto it, or do nothing. *See id.* Even if the Mayor had not acted by August 17, the legislation still would have been enacted into law; only by vetoing the legislation by the deadline would the Mayor have prevented it from becoming law. *See* D.C. Code § 1-204.04(e). The Mayor, however, signed it into law on August 13, 2020. *See* July 2020 Amendment Legislative History at 2-3; 67 D.C. Reg. 9865.

III.   <u>Plaintiffs' Allegations and Procedural History</u>

Plaintiffs filed this lawsuit on August 21, 2020. Compl. [1]. They took no further action until five days later, filing an errata complaint (Complaint) [2] on August 26, 2020. Plaintiffs then filed a motion for emergency injunctive relief on August 28, 2020 [4]. They did not serve the District with the Complaint or their motion for a TRO or a PI until August 31, 2020. *See* Certificates of Service [5, 6].

Plaintiffs assert three causes of action under 42 U.S.C. § 1983, contending that the District violated their rights under the First and Fourteenth Amendments by reducing the signature-gathering requirement for Presidential candidates after the August 5, 2020 deadline to submit a petition. Compl. ¶¶ 51-65. In their motion for a TRO or a PI, plaintiffs ask that the Court (1) declare the District's reduction of the signature-gathering requirement for presidential candidates unconstitutional; (2) enjoin the District from enforcing the statutorily mandated August 5, 2020 ballot access petition deadline; and (3) order the District to accept plaintiffs' nominating

petition and all related documents if submitted by noon on September 8, 2020. *See* Mem. in Support of Pls.' Mot. for TRO and/or PI. (Pls.' Mem.) [4-1] at 22.

## LEGAL STANDARD

Preliminary relief, in the form of either a TRO or a PI, "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

Preliminary relief is meant "to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted); *see Chaplaincy of Full Gospel Churches v. England* (*CFGC*), 454 F.3d 290, 297 (D.C. Cir. 2006). The plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (emphasis added). It is the plaintiff's burden to prove all four prongs of the standard before relief can be granted. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013); *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("It appears [post-*Winter*] that a party moving for a preliminary injunction must meet four independent requirements.").

7

## ARGUMENT

### I.   The Balance of Equities and Public Interest Counsel Against a Preliminary Injunction.

The balance of the equities and the public interest weigh decidedly against plaintiffs here. Nearly six months have now passed since the Mayor first declared a public health emergency for the COVID-19 pandemic. Almost four months have passed since the D.C. Council first passed legislation addressing the signature-gathering requirements for ballot access in the November 2020 election—including a provision permitting candidates to gather signatures electronically. Plaintiffs made no efforts in the ensuing months, either to challenge the signature-gathering requirement or to gather electronic signatures.

The D.C. Council then voted to reduce the signature-gathering requirement for presidential candidates on July 28, 2020, more than a week before the deadline to submit a petition. Plaintiffs took no action then. Even after the Mayor signed the legislation on August 13, 2020, plaintiffs waited more than a week to file suit and waited another week to file for a TRO. Having put themselves in this predicament, plaintiffs now ask the Court to upend BOE's operations and risk delaying the production of general election ballots for all District residents. Relief is not warranted under these circumstances.

Even if plaintiffs could show a likelihood of success on the merits and that irreparable harm would result without preliminary relief, they must show both that "the balance of equities tips in their favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two factors "merge when the Government is

the opposing party" and are thus analyzed together. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (citation and internal quotation marks omitted).

Plaintiffs cannot meet their burden on either factor because they did not bring this lawsuit or seek emergency relief in a timely fashion. Plaintiffs repeatedly contend that COVID-19 limited Mr. De La Fuente's ability to gather the required signatures. Pls.' Mem. at 4-5, 16; Compl. ¶¶ 4, 8, 40-45, 49. Those limitations, however, first arose more than four months ago. *See* Background Section II above (stay-at-home order imposed on March 30, 2020). More importantly, however, the D.C. Council passed the May 13, 2020 Emergency Act more than three months before plaintiffs filed this lawsuit or sought preliminary relief. Included in that legislation was a provision permitting candidates for office to gather any required signatures electronically—a provision plaintiffs ignore altogether in emphasizing the risks associated with in-person signature gathering. *See* D.C. Code § 1-1001.08(b)(3A).

Nothing in the record indicates plaintiffs took any action to challenge the signature-gathering requirement before filing this lawsuit in late August, even though the District began restricting in-person interactions back in March. *Cf. Garbett v. Herbert*, — F. Supp. 3d —, 2020 WL 2064101, at *3 (D. Utah Apr. 29, 2020) (enjoining state to lower ballot signature requirement where plaintiff candidate asked governor to modify signature-gathering requirement on March 11, 2020). Plaintiffs' untimely action does not warrant emergency relief from this Court. Even amid COVID-19, other courts have rejected injunction motions brought with less

9

delay. *See, e.g., Garcia v. Griswold*, Civil Action No. 20-1268, 2020 WL 4003648, at *4 (D. Colo. Jul. 15, 2020) (denying preliminary relief where plaintiffs waited 38 days before suing to be placed on ballot); *see also Tripp v. Scholz*, Civil Action No. 14-0890, 2014 WL 4179840, at *3 (S.D. Ill. Aug. 22, 2014) (rejecting preliminary injunction where Illinois Green Party candidates filed "eleventh-hour 'emergency' motion" seeking to be placed on state election ballot that "suffer[ed] from deficiencies entirely attributable to Plaintiffs themselves").[2]

Moreover, granting the relief plaintiffs request could upend the District's ballot printing process, jeopardizing the timely production of election ballots for all District residents. BOE has a time-tested process in place for preparing election ballots that requires finalizing its list of candidates by September 11, 2020. Miller Decl. ¶ 4. This deadline is necessary so that absentee ballots, paper ballots, electronic ballots and ballots for those with disabilities can be prepared in time for the election—a process especially important this year as BOE prepares to send each voter a mail-in ballot as a COVID-19 safety precaution. *See id.*; July 2020 Amendment, Sec. 2(b)(2) (BOE must "mail every registered qualified elector an absentee ballot and a postage-paid return envelope" for November 2020 General Election).

Despite this process, plaintiffs ask that Mr. De La Fuente have until

---

[2]     This is also not the first time Mr. De La Fuente has sought—and been denied—last-minute relief to make up for his own neglect in ballot access cases. *See, e.g., De La Fuente v. S. Carolina Democratic Party*, 164 F. Supp. 3d 794, 804 (D.S.C. 2016); *De La Fuente v. Merrill*, 214 F. Supp. 3d 1241, 1251 (M.D. Ala. 2016); *De La Fuente v. Kemp*, Civil Action No. 16-2937, 2016 WL 9023598, at *7 (N.D. Ga. Aug. 30, 2016); *De La Fuente v. California*, No. 16-56261, 686 F. App'x 383 (Mem.) (9th Cir. Mar. 30, 2017).

September 8, 2020, to gather all of the required signatures—a process he admits he has not started—and to submit his late petition. *See* Pls.' Mem. at 22. BOE, however, is required by statute to post any submitted nomination petitions for 10 days so that members of the public may object to their validity. D.C. Code § 1-1001.08(o)(1); Miller Decl. ¶ 7. Far from being in the public interest, permitting Mr. De La Fuente to submit a late petition would upend BOE's timeline and could jeopardize timely ballot access for all District residents. *See* Miller Decl. ¶ 12. Plaintiffs' requested relief would impose this risk on the District's election process for an exigency of plaintiffs' own making. *See De La Fuente v. Kemp*, Civil Action No. 16-2937, 2016 WL 9023598, at *7 (N.D. Ga. Aug. 30, 2016) (rejecting Mr. De La Fuente's PI motion where "[a]ny harm to Plaintiff in this case is of his own doing" and injunction "would interfere with a complicated election implementation process that must satisfy federal and state requirements for when and how ballots must be produced and made available for absentee, early, and election-day voting"). The balance of the equities and the public interest weigh strongly in the District's favor and counsel against granting injunctive relief.

## II.   Plaintiffs Cannot Show a Likelihood of Success on the Merits.

Plaintiffs also cannot prevail on their motion because they cannot show a likelihood of success on the merits. *See Davis*, 571 F.3d at 1296. Plaintiffs' fundamental legal contention is that they did not have sufficient notice for Mr. De La Fuente to submit a nomination application. *See* Compl. ¶¶ 52, 59, 63. That

contention, however, cannot prevail under any of the legal theories they have put forward.

### A.   The District Did Not Violate Plaintiffs' First and Fourteenth Amendment Rights.

Plaintiffs attempt to shoehorn contentions about inadequate notice into claims under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[3] Compl. ¶¶ 51-54, 62-65. Their claims do not fit this rubric and cannot succeed.

In cases challenging election regulations applicable to third-party candidates, courts generally analyze First Amendment and Equal Protection Claims together. *See Libertarian Party v. District of Columbia Bd. of Elections & Ethics (Libertarian Party I)*, 768 F. Supp. 2d 174, 180 (D.D.C. 2011); *but see Williams v. Rhodes*, 393 U.S. 23, 34 (1968) (concluding "immediate and crippling impact" of state's 15 percent signature requirement and burdensome ballot access procedural requirements amounted to "invidious discrimination … in violation of the Equal Protection Clause"). Although plaintiffs try to invoke this legal framework, the claims raised in their Complaint do not target a specific requirement as unconstitutionally burdensome. Plaintiffs merely take issue with the D.C. Council's reduction of the signature-gathering requirement for presidential candidates with what they contend is insufficient notice to prospective candidates. *See* Compl. ¶¶ 52, 59, 63.

---

[3]   "[T]he Equal Protection Clause of the Fourteenth Amendment applies to the District of Columbia through the Due Process Clause of the Fifth Amendment." *Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011).

Plaintiffs nevertheless argue in their motion for injunctive relief that the District's previous one-percent signature requirement was unconstitutional. Pls.' Mem. at 14-15. Even if that were relevant to their claims, plaintiffs are incorrect. Central to election law is the premise that governments "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Such regulations are generally subject only to rational basis review, and a State's important regulatory interests will usually suffice under that standard. *See Libertarian Party v. District of Columbia Bd. of Elections & Ethics (Libertarian Party II)*, 682 F.3d 72, 74 (D.C. Cir. 2012) (District regulation prohibiting disclosure of vote totals for write-in candidates "no doubt impose[d] burdens on write-in candidates" but was not "severe, or anything but reasonable and nondiscriminatory" (citation, alteration, and internal quotation marks omitted)). Only if it "impos[es] severe burdens on plaintiffs' rights" will an election regulation be subject to strict scrutiny. *Timmons*, 520 U.S. at 358; *see also Clements v. Fashing*, 457 U.S. 957, 963 (1982); *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

Under a rational basis analysis, the government's regulatory interests suffice to justify "reasonable, nondiscriminatory restrictions" on ballot access for third-party candidates. *Timmons*, 520 U.S. at 358. Notably, states (and the District) have "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and

13

confusing to encumber the ballot with the names of frivolous candidates." *Anderson*, 460 U.S. at 788 n.9. Accordingly, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438. This is true of ballot-access laws requiring third-party and independent candidates to acquire specified numbers of signatures. *See Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016) ("Neither the Supreme Court nor any circuit court has struck down a statewide ballot-access regime on the grounds that a signature requirement of five percent (or less) is too much … .").

Ballot-access laws fail as unconstitutional only in rare circumstances involving exceptionally burdensome requirements. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 24-25 (1968) (Ohio ballot-access regime unconstitutional where law required third-party candidates to obtain signatures from 15 percent of the electorate and imposed onerous procedural requirements such as convention delegate quotas). Notably, the Supreme Court has upheld signature-gathering requirements more demanding than the District's pre-pandemic one-percent requirement. In *Jenness v. Fortson*, for instance, the Supreme Court upheld as constitutional a Georgia election code provision requiring non-major-party candidates for office to obtain signatures from 5 percent of the state's registered voters. 403 U.S. 431 (1971). Contrasting Georgia's requirements with those at issue in *Williams*, the Court reasoned that any candidate could choose any number of routes to running for office in Georgia, and that under Georgia's straightforward legal regime, candidates for governor and President had

successfully petitioned to appear on the ballot in the years leading up to the Court's decision. *Id.* at 439. The Court acknowledged that the five percent signature requirement was "somewhat higher" than the requirements in other states but concluded this was offset "by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.* at 442; *see also De La Fuente v. Padilla*, 930 F.3d 1101, 1106-07 (9th Cir. 2019) (rejecting constitutional challenge to California's one-percent signature-gathering requirement).

Under that rubric, the District's signature-gathering requirement for Presidential candidates was constitutional even when it required candidates to submit signatures from one percent of eligible voters—before the D.C. Council chose to reduce the requirement to 250 valid signatures. *See* D.C. Code § 1-1001.08(f); 3 DCMR §§ 1500-1508; *see also* H. Rep. No. 93-258, at 3 (Congressional rationale for District's previous one-percent requirement was to lessen the burden on third-party presidential candidates and bring the District in line with the standard practices of other states); S. Rep. No. 93-371, at 3 (same).

The relevant interests here also go beyond just the District's, as it was Congress that enacted the signature requirement. Under its mandate as set out in the 23rd Amendment, Congress passed the 1961 Amendment to create legislation "by which a party might have its electors (later changed to candidates) placed on the ballot." *Kamins v. Bd. of Elections for the District of Columbia*, 324 A.2d 187, 191 (D.C. 1974) (internal quotation marks omitted). Congress sought to ensure "that the

15

residents of the District of Columbia should be provided the cherished right to vote in a national election," and "to adopt procedures that will allow the greatest number of responsible and qualified voters to cast their ballot." *Id.* (quoting S. Rep. No. 869 (1961)). The purpose of imposing a signature requirement on third-party presidential candidates

> was not to restrict the right of citizens to vote for candidates for whom qualified electors had been appointed but, rather, to prevent the necessity of printing on the ballot the names of candidates who are neither the nominees of the major parties nor able to muster the necessary number of signatures (now one percent) of registered voters required under [the law.]

*Id.* at 192. Congress, in other words, acted to "limit the number of names on the ballot by 'requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot … .'" *Id.* (quoting *Jenness*, 403 U.S. at 442). "The governmental interest served by this limitation is to avoid 'confusion, deception, and even frustration of the democratic process at the general election.'" *Id.* (quoting *Jenness*, 403 U.S. at 442). Although states may have only a weak interest in regulating who can run for President, *see* Pls.' Mem. at 8 (citing *Anderson*, 460 U.S. at 794-95), the requirement at issue here expresses not the interest of a state but Congress's judgment about how best to effectuate orderly elections in the District.

Moreover, even if Congress's enactment were analogous to a state-imposed restriction, any burden imposed by the previous signature-gathering requirement was not severe. The Council's May 13, 2020 Emergency Act included a provision permitting third-party presidential candidates to gather signatures electronically

ahead of the November 2020 election, a fact plaintiffs repeatedly ignore. *See* May 13, 2020 Emergency Act, 67 D.C. Reg. 5235. As other courts have indicated, such an enactment is precisely the kind of safeguard that ensures the rights of third-party candidates remain protected during the pandemic. *See Libertarian Party of Ill. v. Pritzker*, — F. Supp. 3d —, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) ("[P]ermitting candidates to submit physical or electronic copies of petitions accommodates the various practical barriers to collecting signatures at this time."); *see also id.* (identifying other jurisdictions that have permitted electronic signature gathering in light of COVID-19). And even if a lower signature requirement "may facilitate further speech and association[,] … that alone does not render the regulation a severe burden." *Libertarian Party II*, 682 F.3d at 75. This is especially true where candidates may gather signatures electronically. A ballot requirement does not violate the Constitution just because it may be "inconvenient for candidates unable to obtain signatures from one percent of District voters in advance of the election." *Id.*[4]

The District's signature requirement for Presidential candidates was reasonable even before it was lowered. Then and now, the signature requirement does not prevent third-party candidates like Mr. De La Fuente from running for office and

---

[4] The Court should disregard plaintiffs' false accusation that the Mayor purposely delayed signing the July 2020 Amendment into law to scuttle other third-party candidates. *See* Pls.' Mem. at 23. The Mayor could have signed the legislation four days later than she did, or vetoed it altogether. *See* D.C. Code § 1-204.04(e) (Mayor can sign or veto emergency legislation up to 10 business days after being transmitted by Council); July 2020 Amendment Legislative History [4-3] at 2-3 (Mayor's deadline to act on legislation was August 17, 2020).

does not prevent his supporters from voting for him or expressing their political views. *Jenness*, 403 U.S. at 438, 440. The District, like any state, may require candidates to make "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Id.* at 442. Congress believed one percent was a reasonable threshold. *See* H. Rep. No. 93-258, at 3; S. Rep. No. 93-371, at 3. And, again, the D.C. Council provided another safeguard by permitting candidates to gather electronic signatures.

Plaintiffs have not raised a claim in their Complaint that the District's previous signature-gathering requirement was unconstitutionally burdensome on their rights. But even if they had done so, they could not succeed on such a claim and cannot show a likelihood of success on the merits.

**B.   The District Did Not Violate Plaintiffs' Due Process Rights.**

In their motion for injunctive relief, plaintiffs do not put forward any arguments that their due process claim, *see* Compl. ¶¶ 55-61, is likely to succeed on the merits. That is for good reason. Plaintiffs are incorrect that the Due Process Clause required the District to extend the nominating petition deadline after lowering the signature-gathering requirement.

As discussed above, the District's signature-gathering requirement was constitutional even before the D.C. Council voted to lower it. It is well-settled that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424

18

U.S. 319, 332 (1976).[5] The hallmark of procedural due process is whether a sufficient review process exists before any such deprivation. *See id.* at 335 (laying out four-factor test for determining whether review procedures adequately protect constitutional interests). But that presupposes a deprivation in the first place, and plaintiffs here have not been deprived of any liberty or property interest. Even if Mr. De La Fuente has some protected interest in seeking to run for office, at no point did the District impede him from collecting signatures or submitting a nominating petition. If anything, the Council made it easier for all candidates back in May by permitting nomination petition signatures to be gathered electronically. *See* D.C. Code § 1-1001.08(b)(3A). And the Council publicly passed the July 2020 Amendment more than a week ahead of the nomination petition deadline. *See* July 2020 Amendment Legislative History at 2.

It is not surprising that plaintiffs identify no authority supporting the kind of due process right they posit. Constitutional due process guarantees generally apply when the government "seeks to remove or significantly alter [a] protected status" it has established by law. *Paul v. Davis*, 424 U.S. 693, 710-11 (1976). For example, a state may not revoke an individual's driver's license or take a parolee back into custody without sufficient procedural safeguards for either one. *Id.* at 711. As the Supreme Court has explained, the key inquiry triggering due process protection is whether "a right or status previously recognized by state law was distinctly altered

---

[5]     Although plaintiffs raise their due process claim under the Fourteenth Amendment, only the Due Process Clause of the Fifth Amendment applies to the District. *See Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001).

or extinguished." *Id.* And even then, courts have declined to interfere with state and local government regulation in certain domains—such as election law. *See De La Fuente Guerra v. Toulouse-Oliver*, 752 F. App'x 579, 582 (10th Cir. 2018) ("In the absence of authority addressing the process required when a state rejects a petition to be placed on a primary ballot, we decline to infer that due process imposes such a requirement under these circumstances.").

Simply put, plaintiffs cannot show they were deprived of any liberty or property interest, or any review process meant to safeguard such a right. They cannot make out a due process claim and cannot show a likelihood of success on the merits.

## III.   Plaintiffs Cannot Show They Will Suffer Likely and Imminent Irreparable Harm Absent Court-Ordered Relief.

Plaintiffs also cannot show the final component of preliminary relief, a likelihood of irreparable harm. "The failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors … merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *CFGC*, 454 F.3d at 297). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted).

Mr. De La Fuente concedes that he has not tried to collect any signatures thus far. *See* Decl. of Roque "Rocky" De La Fuente [4-4] ¶ 12. Importantly, plaintiffs have not claimed that Mr. De La Fuente could in fact acquire the necessary signatures and

submit a valid nomination application in the timeframe they now ask the Court to order. It is plaintiffs' burden to show that the Court can prevent them from suffering irreparable harm by granting the relief they have requested. *See Davis*, 571 F.3d at 1292. Intervention from this Court is not warranted without that showing. *See Leavitt*, 404 F. Supp. 2d at 204.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for a temporary restraining order or a preliminary injunction.

Dated:  September 2, 2020.            Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Micah Bluming*
MICAH BLUMING [1618961]
SHANI C. BROWN [1617726]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C.  20001
(202) 724-7272
(202) 730-1833 (fax)
micah.bluming@dc.gov
shani.brown@dc.gov

*Counsel for Defendant*

21